**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DENNIS FOY,             )
                                  )    Civil Action No. 2:12-0088
            Petitioner,    )
                                  )
v.                             )
                                  )
MARIROSA LAMAS,       )    Magistrate Judge Cynthia Reed Eddy
SUPERINTENDENT; DISTRICT    )
ATTORNEY FOR ALLEGHENY    )
COUNTY; and the ATTORNEY     )
GENERAL FOR THE STATE OF    )
PENNSYLVANIA,           )
                                  )
            Respondents.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

Petitioner, Dennis Foy, a state prisoner incarcerated at the State Correctional Institution at Rockview, Pennsylvania has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in connection with his conviction for Rape and related charges against four elderly women who were sexually assaulted in their bedrooms in the Borough of Homestead, Pennsylvania. For the reasons set forth below, the Petition will be denied. An appropriate order follows.

### A. Relevant Factual and Procedural History

The relevant facts are summarized in the Opinion of the Trial Court on direct review.

> During the year of 1987, a series of sexual assaults involving various elderly women occurred in the Borough of Homestead, Pennsylvania. The crimes committed exhibited a unique pattern which indicated that the assaults were the work or "signature" of a single perpetrator in that all of the crimes involved women between the ages of 61 and 85 who lived alone at the time of the assaults; all of the assaults occurred between the hours of 12:30 A.M. and 3:25 A.M. within a densely populated two and one-half block area of Homestead. The

---

1 The parties consented to jurisdiction by a United States Magistrate Judge. *See* ECF Nos. 14 and 16. *See also* 28 U.S.C. § 636(c)(1).

means of entry was primarily a window; once inside the house, the assailant would bind the victim with clothing, bedclothes or other objects found in the house, sexually assault her and then burglarize the residence. During the attacks the actor stated "shut up or I'll kill you," and was felt by the victims to be a black male, this being ascertained by description of victim, voice identification and hairs found at the scene which were foreign to the victims.

Chronologically, the crimes took place as follows: On February 2, 1987, a seventy-five year old female, [C.R.], was raped and her home was burglarized. Items taken during the burglary included ninety-two dollars ($92.00) cash, two (2) portable television sets, a gold chain and a ladies' Timex watch with a black band. On March 1, 1987, a sixty-four year old female, [D.H.], was raped and her home burglarized. Items taken during the burglary included sixteen (16) silver spoons, a solid gold bracelet and forty-five dollars ($45.00) cash. On April 24, 1987, the home of a seventy-six year old female, [E.F.], was burglarized and the actor attempted, but failed to rape her. Items taken during the burglary included two hundred forty-six dollars ($246.00), two bracelets, and a watch. On June 18, 1987, an eighty-five year old female, [E.L.], was raped and her home was burglarized. Less than one hundred dollars ($100.00) was taken by the actor. On August 25, 1987, the same women [sic] who was victimized on April 24, 1987, [E.F.], was raped and her home burglarized for the second time. Items taken during the burglary included less than fifty dollars ($50.00), an airhorn, and two (2) rifles, one of which was a Remington 20 [gauge] shotgun.

In early September of 1987, an Allegheny County Police Detective, Richard Ross, received information from a confidential informant that defendant, Dennis Foy, was in possession of the Remington 20 gauge shotgun that had been stolen from the home of [E.F.] on August 24, 1987. Detective Ross was told by the informer that defendant was going to the Steel City Pawn Shop in Braddock on September 3, 1987, at approximately 2:00 P.M. to get the weapon out of pawn.

After notifying the police task force supervising the investigation of the Homestead rapes of this information, Detective Ross and his partner proceeded to the pawn shop where they arrived at approximately 1:00 P.M. on September 3, 1987. The detectives placed the pawn shop under surveillance and, thereafter, observed the defendant arrive at approximately 2:15 P.M. Detective Ross and his partner entered the pawn shop where they observed the defendant with the claim ticket for the gun in his possession attempt to get the shotgun out of pawn.

At that time, the manager of the pawn shop refused to give the shotgun to the defendant, due to the fact that the defendant had no identification as required by law to obtain firearms out of pawn. The defendant then told the manager that he would obtain identification and return to the shop and exited the store. At approximately 3:10 P.M. the defendant re-entered the establishment, produced the required identification and obtained the shotgun. Detective Ross immediately

placed the defendant under arrest on the charge of receiving stolen property and notified him of his rights.

Trial Court Op. at 1-3 (ECF No. 1-1, pp 2-4).

Petitioner was charged with five counts of burglary, four counts of rape, three counts of robbery, two counts of theft by unlawful taking or disposition, one count of involuntary deviate sexual intercourse and one count of receiving stolen property. The case against Petitioner was primarily based upon: 1) inculpatory statements made while in custody; 2) items seized under the authority of a search warrant from the residences of his parents and girlfriend that were identified as belonging to the victims; and 3) samples of hair and fingerprints recovered at the homes of the victims that matched Petitioner's hair and fingerprints.

Subsequently, David S. Shrager, Esquire, entered his appearance to represent Petitioner. Attorney Shrager filed a series of pre-trial motions on Petitioner's behalf. On February 1, 1988, he filed a Motion for Sequestration of Jurors, a Motion for Change of Venue/Venire asserting prejudicial pre-trial publicity, and a Motion for Individual *Voir Dire*. On February 2, 1988, he filed an Omnibus Pre-Trial Motion seeking suppression of items seized from searches of 333 W. 14th Avenue and 126 E 12th Avenue, Homestead, Pennsylvania. That same date, he filed a Motion to Sever and a second Omnibus Pre-Trial Motion seeking to suppress statements, fingerprint evidence and a gun. Finally, he filed a Motion for Bill of Particulars and for Formal Discovery. A hearing was held before the Honorable John W. O'Brien on March 7, 1988 after which the motions for change of venue and venire were denied, individual *voir dire* was granted, the request for juror sequestration was taken under advisement, the motion to sever was denied, and the motion for discovery was resolved by agreement. An additional hearing was held March 9, 1988 on the motions to suppress; by Order of Court entered March 16, 1988, these motions were denied.

On March 28, 1988, Petitioner proceeded to a jury trial in the Court of Common Pleas of Allegheny County before the Honorable John W. O'Brien. The jury returned its verdict on April 5, 1988, finding Petitioner guilty as charged. On January 3, 1989, Petitioner was sentenced to a total of 100 to 200 years imprisonment. Petitioner filed a direct appeal and on May 29, 1990, a divided Superior Court panel affirmed his judgment of sentence. *See* <u>Commonwealth v. Foy</u>, 394 Pa. Super. 442, 447, 576 A.2d 366, 368) (1990). Thereafter, a Petition for Allowance of Appeal (PAA) to the Supreme Court of Pennsylvania was filed and docketed at No. 93 W.D. Appeal Docket 1990. The PAA was granted on the following issue: "as a question of first impression whether the trial court erred in admitting into evidence testimony that following Petitioner's arrest, no further crimes of the type that Petitioner was accused of were reported." The Supreme Court found that the admission of this testimony was error but that the error was harmless. Accordingly, on September 18, 1992, the judgment of the Superior Court was affirmed on an alternative basis which in turn affirmed the judgment of sentence of the Court of Common Pleas of Allegheny County. *See* <u>Commonwealth v. Foy</u>, 531 Pa. 322, 324-325, 612 A.2d 1349, 1350-1351 (1992).

On October 26, 1994, Petitioner filed a *pro se* petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. §9541, *et seq.* and Judge O'Brien appointed the Office of the Public Defender to represent Petitioner in connection with this petition. Several Motions for Extension of Time were filed and were granted by Judge O'Brien. On October 2, 2002, another Motion for Extension of Time was filed and was granted by Judge Machen, to whom the case had been reassigned. On May 8, 2003, Scott B. Rudolf, Esquire, of the Office of the Public Defender, filed a Motion for Post Conviction DNA Testing and to Stay Proceedings During Testing. On May 30, 2003, Judge Machen entered an Order of Court requiring Petitioner

to contact the Allegheny County Forensic Laboratory to determine whether the evidence sought was available for DNA testing.

On October 30, 2003, Attorney Rudolph filed an Amended Petition for Post Conviction Collateral Relief. A second Amended Post Conviction Petition was filed on April 23, 2004. Evidentiary hearings were held on August 16 and October 14, 2004. An additional proceeding was held on January 24, 2006. On December 10, 2007, Judge Machen entered an Order of Court denying post-conviction relief. Attorney Shrager filed a timely appeal and Judge Machen issued his Opinion on December 30, 2008. The Superior Court affirmed the dismissal of the PCRA on May 27, 2010. Petitioner filed a Petition for Allowance of Appeal, which was denied by the Supreme Court of Pennsylvania on February 3, 2011.

Petitioner filed his Petition for a Writ of Habeas Corpus with this Court on January 25, 2012 wherein he set forth the following claims.

1. Petitioner's Fourteenth Amendment due process rights were violated when the Commonwealth destroyed biological evidence from his trial before postconviction DNA testing could be performed on that evidence.

2. Petitioner's Sixth Amendment public trial and Fourteenth Amendment due process rights were violated when the individual *voir dire* portion of his trial's jury selection phase was conducted in chambers, and thus outside the view of the general public.

3. Petitioner's Sixth Amendment effective counsel and Fourteenth Amendment due process rights were violated when Trial Counsel ineffectively failed to object to the individual *voir dire* portion of his trial's jury selection phase being conducted in chambers, and thus outside the view of the general public, absent Petitioner's intelligent, knowing, and voluntary waiver of his Sixth Amendment public trial and Fourteenth Amendment due process rights.

4. Petitioner's Sixth Amendment impartial jury and Fourteenth Amendment due process rights were violated when he was forced to stand trial on five different criminal cases that were consolidated into a single case.

5.	Petitioner's Sixth Amendment effective counsel and Fourteenth Amendment due process rights were violated when Trial Counsel ineffectively failed to assert, both in the trial court and in his direct appeal, that forcing him to stand trial on five different criminal cases that were consolidated into a single case violated not only the Pennsylvania Rules of Criminal Procedure but also the Sixth and Fourteenth Amendments to the United States Constitution.

6.	Petitioner's Fourteenth Amendment due process rights were violated when he was convicted by a jury that received incomplete and/or inaccurate instructions on the subjects of confession evidence, alibi evidence, and the crime of Burglary.

7.	Petitioner's Sixth Amendment effective counsel and Fourteenth Amendment due process rights were violated when Trial Counsel ineffectively failed to object to incomplete and/or inaccurate instructions being read to his jury on the subjects of confession evidence, alibi evidence, and the crime of Burglary.

8.	Petitioner's Sixth Amendment effective counsel and Fourteenth Amendment due process rights were violated when Trial Counsel ineffectively failed to call known and available good character witnesses to testify at his trial.

9.	Petitioner's Fourteenth Amendment due process rights were violated when the prosecution was permitted to introduce inflammatory and unduly prejudicial testimony from the Homestead Chief of Police indicating that no similar rapes had occurred after Petitioner's arrest, and when his trial continued absent a cautionary instruction or a mistrial as sought by Petitioner.

10.	Petitioner's Sixth Amendment impartial jury and Fourteenth Amendment due process rights were violated when his case was tried before an Allegheny County jury rather than, as he requested, by a jury drawn from another area of the state that was not inundated with the prejudicial pretrial publicity that existed in Allegheny County.

11.	Petitioner's Fifth Amendment self-incrimination and Fourteenth Amendment due process rights were violated when his extrajudicial statement to police investigators was not excluded from evidence at his trial.

12.	Petitioner's Sixth Amendment right to jury decision making and his Fourteenth Amendment due process rights were violated when his defense attorney was precluded from arguing to the jury that his putative confession was in fact involuntarily uttered, and when he was further

prevented from having his jury decided for itself whether his confession voluntary or involuntary.

13.      Petitioner's Fourteenth Amendment due process rights were violated when he was precluded from calling an Assistant District Attorney to testify as a witness on the issue of the voluntariness of Petitioner's putative confession.

14.      Petitioner's Fourteenth Amendment due process rights were violated when his trial was allowed to proceed, over his timely objection, in the face of prosecutorial misconduct.

15.      Petitioner's Sixth Amendment speedy and public trial rights, Sixth Amendment compulsory process rights, Eighth Amendment cruel punishment rights, and Fourteenth Amendment due process rights (including his right to meaningful access to the state court system) were violated when Respondent and the Commonwealth of Pennsylvania permitted an inordinate delay of nine (9) years to elapse between the completion of Petitioner's direct appeal and action on his properly filed Petition for Post-Conviction Collateral Relief.

16.      Petitioner's Sixth Amendment effective counsel and Fourteenth Amendment due process rights were violated when State Post-Conviction Counsel failed to take action to prevent the inordinate nine-year delay referred to in Ground for Relief No. 15 from occurring.

Petitioner presented these claims to the Pennsylvania State Courts in his direct and post-conviction proceedings.

## B. Standard of Federal Habeas Corpus Review

In describing the role of federal habeas corpus proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas

'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C.§ 2254(d).

"Clearly established Federal law" should be determined as of the date of the relevant state-court decision and is limited to the record that was before the state court that adjudicated the claim on the merits.  Greene v. Fisher, ___ U.S. ___, 132 S.Ct. 38 (2011); Cullen v. Pinholster, 563 U.S. ——, 131 S.Ct. 1388, 1398 (2011).  A state-court decision is "contrary to" clearly established federal law if the state court (1) contradicts the governing law set forth in Supreme Court cases or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Jamison v. Klem, 544 F.3d 266, 274 (3d Cir. 2008).  The state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court, Williams, 529 U.S. at 405, although district and appellate federal court decisions evaluating Supreme Court precedent may amplify such precedent,

Hardcastle v. Horn, 368 F.3d 246, 256 n. 3 (3d Cir. 2004) (citing Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999)). The state court is not required to cite or even have an awareness of governing Supreme Court precedent "so long as neither the reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8, (2002); Jamison, 544 F.3d at 274-75. Few state court decisions will be "contrary to" Supreme Court precedent.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. A state-court decision 'involves an unreasonable application" of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case; or (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. Williams, 529 U.S. at 407. A showing of clear error is not sufficient. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). Nor is habeas relief available merely because the state court applied federal law erroneously or incorrectly. Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005); Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. ——, ——, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Harrington, 131 S. Ct. at 786–87.

The Supreme Court repeatedly has reiterated the deference that the federal courts must accord to state court decisions. *See* Felkner v. Jackson, ––– U.S. –––, 131 S.Ct. 1305, 1307 (2011) ("AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."); Harrington v. Richter, ___U.S.___, 131 S.Ct. 770, 786 (2011) ("We must use habeas corpus as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."); Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855, 1862 (2010) ("whether the trial judge was right or wrong is not the pertinent question under AEDPA"); Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); Lockyer v. Andrade, 538 U.S. 63, 75 (2003) ("it is not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was erroneous.").

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. *Id*. (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)).

**D. Petitioner's Claims**

1.  <u>DNA Evidence</u>

Petitioner first claims that his Fourteenth Amendment due process rights were violated when the Commonwealth destroyed biological evidence from his trial before post-conviction DNA testing could be performed. In this regard, Petitioner claims that "DNA-testable" biological evidence was recovered from each victim's person but that no DNA testing was done on this material prior to trial in 1988 because such testing was not possible then. The evidence was stored in the basement of an Allegheny County Police Department facility known as the "West Penn Building," located at 14 Wood Street in Pittsburgh, Pennsylvania, approximately two blocks from the Monongahela River. As to the biological evidence itself, it was stored on shelves in paper containers (*e.g.*, large envelopes, paper bags, and/or cardboard boxes) and was organized by complainant's name.

Petitioner was convicted of all charges on April 5, 1988 and his conviction was upheld by the Pennsylvania Supreme Court on September 16, 1992. It was not until May 8, 2003, that Petitioner filed an application for DNA Testing. Unfortunately, in the interim, in early 1996, an unexpected flood occurred during which all potential evidence relating to Petitioner's conviction was destroyed.

The Supreme Court's decision in <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988), establishes the standard for determining whether law enforcement officials have infringed on a defendant's due process rights by failing to preserve "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id*. at 57. The Youngblood Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not

constitute a denial of due process of law." *Id*. at 58. To establish bad faith, a defendant must allege that the police knew of the exculpatory value of the evidence at the time it was destroyed. *Id*. at 57, n.1. While <u>Youngblood</u> addresses law enforcement officials' constitutional duty to preserve evidence prior to conviction, the Supreme Court did not indicate that it was limited to its temporal context as it sought to govern applicability of the Due Process Clause in "what might loosely be called the area of constitutionally guaranteed access to evidence" and resolve the violation it described broadly as "the failure of the State to preserve evidentiary material." *Id*. at 55.

The Court reiterated this rule in <u>Illinois v. Fisher</u>, 540 U.S. 544 (2004) wherein it held that the destruction of evidence that occurred in accordance with established police procedures ten years after it was collected did not violate a defendant's due process rights. In that case, Gregory Fisher was charged with possession of cocaine in 1988. He filed a motion for discovery eight days later requesting all physical evidence the State intended to use at trial. The State responded that all evidence would be made available at a reasonable time and date upon request. Fisher, released on bond pending trial, failed to appear in court and remained a fugitive for over 10 years, apparently settling in Tennessee. The State then reinstated the 1988 cocaine-possession charge in November of 1999, after Fisher was detained on an unrelated matter.

Before trial, the State informed Fisher that in September of 1999, the police, acting in accord with established procedures, had destroyed the substance seized from him during his arrest. Fisher filed a motion to dismiss the cocaine-possession charge based on the State's destruction of evidence. The trial court denied the motion and Fisher ultimately was convicted after a jury trial. The Appellate Court reversed the conviction holding that the Due Process Clause required dismissal of the charge. Applying <u>Youngblood</u>, the Supreme Court determined

that Fisher had failed to establish a Due Process violation despite the existence of the pending discovery request. *Id*., at 548. Specifically, the Court concluded that Fisher had failed to show bad faith in the destruction of the evidence. In so concluding, the Supreme Court reiterated that "we adopted the bad-faith requirement in the first place to limit the extent of the police's obligation to preserve evidence to reasonable grounds and confine it to that class of cases where the interests of justice most clearly require it. *Id*. (citing Youngblood, 488 U.S., at 58).

Petitioner raised his claim in his PCRA proceeding and the Superior Court denied Petitioner relief on the basis of the PCRA Court's Opinion, which provides as follows.

### IMPROPER STORAGE AND DESTRUCTION OF PHYSICAL EVIDENCE CLAIMS

The first three issues raised by defendant in his Concise Statement of Errors Complained of on Appeal all stem from the same claim that the defendant's right to post conviction DNA testing were violated by the improper storage and resulting destruction of the physical evidence. These three claims will be addressed together.

With regard to Defendant's claim, 42 Pa.C.S.A. § 9543.1 (a) states, in pertinent part, that:

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion.

42 Pa.C.S.A. § 9543.1(a)(1), (2).

Defendant's claims that he was entitled to relief stem from his assertion that the Commonwealth (through the Allegheny County Police Department) was responsible for improperly storing and/or destroying the physical evidence and

that the circumstances surrounding the flooding and the subsequent destruction of the evidence in question - exercised bad faith. . . .

The question must then turn to the question of bad faith. . . .

At the evidentiary hearing on November 18, 2003, Officer Ryan credibly testified that evidence had been stored in said facility from 1981 to the January 1996 date of the flood and there had been no prior water infiltration at that site. Further investigation revealed that there had not previously been a flood of the magnitude of January 1996 since 1972. The time before that was 1936. The County Police had no reason to believe that the evidence was in danger of flooding. DNA Expert Houck credibly testified that the Allegheny County Police stored evidence, in evidence bags inside brown paper bags in sealed boxes. She testified that this was a "very standard and commonplace and acceptable method of storing" evidence. Based upon the credible testimony presented, this court found that the Allegheny County Police evidence storage was not improper.

Testimony at the November 18, 2003 hearing established that during the inventory of flood damaged evidence, only the evidence bag from County Police case # 870650, victim Leskanic, was identifiable. Evidence from the remaining cases was not identifiable and thus could not have been preserved. Further, because of the mixing of outside biological material and possible cross-contamination, the Leskanic evidence may have been compromised. The evidence contaminated in the January 1996 flood was destroyed pursuant to a Court Order because of contamination by sewage waters, mud, cross-contamination, and the possibility of spontaneous combustion of agricultural materials (quantities of marijuana). Officer Ryan was required to be inoculated against tetanus and hepatitis and wear HAZMAT clothing during the inventory of the contaminated evidence.

The only evidence pertaining to petitioner's convictions identified at the Wood Street facility was evidence from the Leskanic case. The evidence in that case was contained in a paper evidence bag which was dripping wet and had been floating in sewage-contaminated floodwaters mixed with blood and other biological evidence from other cases. Such conditions could have resulted in bacterial degradation and/or cross-contamination.

Upon review of the testimony, the defendant did not demonstrate prosecution's bad faith in ordering or permitting its destruction; absent such a showing, failure to preserve evidence which might be of use to a criminal defendant after testing does not constitute a denial of due process.

PCRA Court Opinion, pp. 3- 6 (internal record and legal citations omitted) (ECF No. 1-6, pp. 5-

8).

Whether the state's failure to preserve material exculpatory evidence violated due process is a mixed question of law and fact; however, the question of the state's good or bad faith is a factual inquiry and the presumption of correctness applies. *See* <u>West v. Zenon</u>, Civil No. 92-35341, 1993 WL 360740, at *3 (9th Cir. Sept. 15, 1993). Petitioner has failed to rebut the presumption of correctness as to the findings of the Pennsylvania Court with any evidence, let alone clear and convincing evidence. Specifically, he has failed to submit any evidence whatsoever that the Allegheny County Police Department knew, or had any reason to know, of any exculpatory value of the evidence destroyed in the 1996 flood. As such, he is not entitled to relief with respect to his first claim.

2-3. *Voir Dire*

Next, Petitioner claims that his Sixth Amendment public trial and Fourteenth Amendment due process rights were violated when the individual *voir dire* portion of his trial's jury selection phase was conducted outside the view of the general public and that trial counsel was ineffective for failing to object to this process. The Sixth Amendment right to a public trial applies to *voir dire* proceedings.

> Jury selection is an integral and critical component of any criminal proceeding which must, presumptively, be open to the public and the press; while the Sixth Amendment right to public trial is not absolute and inflexible, closure is and should be the rare exception, and may not be ordered absent careful balancing of competing interests, consideration of alternatives to closure, and articulation of findings.

<u>Constant v. Pennsylvania Dept. of Corrections</u>, Civil No. 11-822, 2012 WL 6554905, 1 (W.D. Pa. Dec. 14, 2012) (citing <u>Presley v. Georgia</u>, 558 U.S. 209 (2010)).

The relevant facts with regard to this claim are as follows. Jury selection in Petitioner's case began on March 23, 1988, on which date his trial judge, the Honorable John W. O'Brien, announced that while the general *voir dire* of venire persons would take place in the courtroom,

individual *voir dire* would occur in his chambers - a non-public part of the courthouse. The jurors were to be brought to the courtroom and a general inquiry would occur; thereafter, individual *voir dire* would be conducted in chambers where the media and family members were also invited. The judge pointed out that this arrangement would permit the jurors to be questioned without other jurors overhearing their answers. The record reflects that there were always five members of Petitioner's family present during the jury selection and that no-one who asked to be admitted was denied.

Petitioner raised this claim in his PCRA proceeding where the Court held as follows.

<u>IMPROPER JURY SELECTION PROCESS</u>

Issues 6 and 7 raised by defendant in his Concise Statement of Errors Complained of on Appeal both stem from the claim that the defendant's rights were violated when critical portions of the jury selection phase of defendant's trial were conducted outside of the presence of the general public and trial counsel was ineffective for failing to object to this aspect of the jury selection process. These two claims will be addressed together.

A review of the trial records and transcripts reveal that prior to the trial Judge O'Brien discussed the need to conduct individual juror *voir dire* in chambers and that members of the public were free to come into his chambers to observe the *voir dire*. As a result, the general public was not excluded from the *voir dire*.

Additionally, at the October 14, 2004, PRCA evidentiary hearing on Defendant's PCRA Petition, trial counsel testified that he had filed a pre-trial motion requesting individual *voir dire* and it was trial strategy to conduct individual *voir dire* of the individual jurors in the judge's chambers to protect the venire from possible contamination from hearing questioning of other members of the venire. As such, this was a part of trial counsel's strategy and as a result, this claim fails to meet the three-prong test for ineffective assistance of counsel.

PCRA Opinion (ECF No. 1-6, pp. 9-10) (internal citations omitted).

In its review of this claim, the Superior Court made the following determination.

In his third claim of error, Foy argues that his federal and state constitutional rights were violated when the individual *voir dire* portion of his trial was conducted in the trial judge's chambers and outside of the presence of the

public, without Foy's Informed consent.  Foy also claims that his trial counsel was ineffective for failing to object to the in chambers individual *voir dire*.

In its Opinion, the PCRA court addressed Foy's ineffectiveness claim and concluded that Foy was not entitled to relief.  Specifically, the PCRA court determined that Foy had failed to establish that his counsel lacked a reasonable basis for failing to object to the trial court's *voir dire* procedure.  We agree with the reasoning of the PCRA court and affirm on this basis.

Sup.Ct.Op. (ECF No. 1-7, pp. 12-13) (internal citations omitted).

My independent review of this claim reveals that it has no basis in law or in fact. Specifically:  no member of the public was excluded from the jury selection proceedings; Petitioner's family members were present during the proceedings; other individuals were present in chambers; the media was invited to attend the in-chambers *voir dire*; and no-one was specifically excluded who wished to attend.  Thus, there was no violation of Petitioner's Sixth Amendment right to a public trial.  *Accord* United States v. Vaghari, Civil No. 11–2648, 2012 WL 4707063, 9 (3d Cir. Oct. 4, 2012) ("the District Court did not close the courtroom or explicitly exclude any member of the public from observing *voir dire*.  Although certain portions of the individual *voir dire* did take place behind "closed doors," doing so was the functional equivalent of a sidebar discussion and no more improper than that commonly accepted practice.").

Moreover, Petitioner has failed to show that Petitioner's Trial Counsel rendered ineffective assistance of counsel with regard to his jury selection process.  The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:  1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense.  Strickland, 466 U.S. at 687.  The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious

that he or she was not functioning as "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688. The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair and unreliable. Strickland, 466 U.S. at 689. A defendant is not entitled to relief unless he makes both showings. Id. at 687. Pennsylvania applies the same test for ineffective assistance of counsel as the Strickland test used in federal courts. Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000).

Here, Defense Counsel stated that he wanted individual *voir dire* to be conducted in chambers away from the venire itself so that he could talk to each of these jurors separately. Defense Counsel further stated that this trial strategy was designed to assure that Petitioner's jury remained untainted. As this was a reasonable trial strategy, it is clear that the Superior Court's determination is not contrary to, or an unreasonable application of, clearly established Supreme Court law under Strickland. *Accord* Horton v. Allen, 370 F.3d 75, 82-83 (1st Cir. 2004) (holding that defense counsel's decision to agree to a closed individual *voir dire* was an objectively reasonable strategy designed to elicit forthcoming responses from the jurors); Griffith v. Tucker, Civil No. 3:11-288, 2012 WL 3230413, 9 (N.D. Fla. July 5, 2012) (defendant failed to show that, if counsel had objected in a timely fashion and had persuaded the trial judge not to partially close the courtroom, it would have caused the fact-finder to have a reasonable doubt about his guilt).

4 & 5. Joinder of Offenses

In his next two claims, Petitioner asserts that his Sixth Amendment and Fourteenth Amendment rights were violated when he was forced to stand trial on five different criminal cases that were consolidated into a single case. In this regard, the cases brought against Petitioner arose from five criminal incidents (involving four victims, with one woman victimized

twice). The Commonwealth charged crimes arising from the five criminal incidents in three criminal complaints and consolidated those three complaints into a single case doing so pursuant to the authority granted to it by former Pa. R. Crim. P. 1127. Trial Counsel responded to this consolidation by filing, on February 2, 1988, a Petition for Severance. That pleading sought severance pursuant to former Pa. Rule Crim. Proc. 1128, since renumbered as Pa. Rule Crim. Proc. 583. On March 5, 1988, the trial judge denied that motion and, thereafter, the five cases against Petitioner were tried together. Petitioner raised this issue in his direct appeal.

The propriety of a consolidation rests within the sound discretion of the state trial judge. Joinder of offenses rises to the level of a constitutional violation only if it actually renders Petitioner's state trial fundamentally unfair and hence, violative of due process. *See* United States v. Lane, 474 U.S. 438, 446 n. 8 (1986). Therefore, in order for a defendant to prevail on a claim that he was tried on charges impermissibly joined, he must establish that his trial was rendered fundamentally unfair by simultaneous trial of more than one offense. The argument against joinder of offenses is that the defendant may be prejudiced by the possibility that the jury may use the evidence of one of the crimes charged to infer a criminal disposition; or the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. Notwithstanding, to succeed on a claim of unconstitutional joinder, a petitioner must show that actual prejudice resulted from the events as they unfolded during the joint trial. Tribbitt v. Wainwright, 540 F.2d 840, 841 (2d Cir. 1976) (joinder must "actually" render trial fundamentally unfair before habeas relief is appropriate). *Cf.* United States v. Walker 657 F.3d 160, 170 (3d Cir. 2011) (a defendant must pinpoint clear and substantial prejudice resulting in an unfair trial); United States v. Lore, 430 F.3d 190, 205 (3d Cir. 2005) (A defendant bears "a heavy burden and must demonstrate not only that the court

would abuse its discretion if it denied severance, but also that the denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial.") (internal citations and quotations omitted). In the absence of actual prejudice, a simultaneous trial of more than one offense does not render a state trial fundamentally unfair.

A defendant bears a heavy burden in showing prejudice from joinder; he or she must demonstrate that joinder will result in a "manifestly unfair trial, beyond a mere showing that he would have had a better chance of acquittal with separate trials." Government of Virgin Islands v. Sanes, 57 F.3d 338, 341–342 (3d Cir.1995) (internal quotations omitted)). In considering whether a criminal defendant was prejudiced by the joinder of multiple charges, our circuit court of appeals has considered factors such as: 1) whether the presentation of separate counts with distinct and extensive evidence confused the jury, 2) whether the charging of several crimes made the jury hostile, and 3) whether the jury was able to segregate the evidence as to each count. United States v. Torres, 251 Fed. App'x 763, 764 (3d Cir. 2007) (citations omitted). Of primary concern in considering a motion for severance is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to each count by following the instructions of the trial court. United States v. Reicherter, 647 F.2d 397, 400 (3d Cir. 1981) (quotations omitted). *See also* Burnett v. Collins, 982 F.2d 922, 929 (5th Cir. 1993) (considering whether the evidence of each separate charge would have been admissible in a trial of one of the charges); Breeland v. Blackburn, 786 F.2d 1239, 1240 (5th Cir. 1986) (considering the strength of the evidence against the defendant on each charge); Tribbitt, 540 F.2d at 841 (considering whether the charges "arose out of the same criminal episode").

With respect to Petitioner's claim, the state courts made the following determination.

The circumstances of the five criminal episodes consolidated for trial here were sufficiently similar, and the offenses were sufficiently linked temporally and

spatially to make them admissible in separate prosecutions and to support consolidation for trial. All of the crimes involved women between the ages of sixty-one (61) and eighty-five (85) who lived alone at the time of the assaults. All of the assaults occurred between 12:35 A.M. and 3:25 A.M. within a two and one-half block area in the community of Homestead. In all cases the actor said, "shut up or I'll kill you" when the victims tried to scream and in all cases the perpetrator bound the victims with articles found in the house. The similarity in the timing, implementation, and area where the crimes occurred provides the distinctive and unusual *modus operandi* which would justify the conclusion that the perpetrator of one was the perpetrator of the other. There was no abuse of discretion by the court in rejecting defendant's claim.

Trial Ct. Op. (ECF No. 1-1, pp. 7-8) (adopted in full by the Superior Court of Pennsylvania).

This state disposition is consistent with existing precedent of the United States Supreme Court. It does not involve any unreasonable application of clearly established precedent of the United States Supreme Court. Nor does it appear to be based upon any unreasonable determination of the facts in light of the evidence presented. *Cf.* Government of Virgin Islands v. Sanes, 57 F.3d 338, 341-42 (3d Cir. 1995) (holding that district court did not abuse its discretion in denying motion to sever charges arising from one attack on victim from charges arising from second attack on victim, as victim's testimony and common *modus operandi* provided sufficient reason for joint trial). Consequently, Petitioner is not entitled to habeas relief with respect to any claim related to joinder of his offenses.

6 & 7. Jury Instructions

Petitioner further claims that his Fourteenth Amendment due process rights were violated when he was convicted by a jury that received incomplete and/or inaccurate instructions on the subjects of confession evidence, alibi evidence, and the crime of Burglary and that his counsel rendered ineffective assistance by failing to object.

This Court initially notes that jury instructions are matters of state law. Although the Supreme Court has recognized that "a defendant is entitled to an instruction as to any recognized

defense for which there exists evidence sufficient for a reasonable jury to find in his favor," Mathews v. United States, 485 U.S. 58, 63 (1988), "the burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (emphasis added). Thus, before a federal court may grant federal habeas corpus relief with respect to a state court conviction, "it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment. Id. (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973) (citation omitted)). Even erroneous instructions do not warrant federal habeas relief unless a petitioner demonstrates that the instructions so infected the trial that the resulting conviction violated due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Furthermore, a petitioner raising the omission of an instruction as error has a heavy burden because an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law. Henderson v. Kibbe, 431 U.S. at 155. In weighing the prejudice from an allegedly improper charge, the instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. 72; Flamer v. Delaware, 68 F.3d 736, 736 (3d Cir. 1995).

Moreover, a verdict may still stand, despite erroneous jury instructions, where the predicate facts "conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause the injury." Rose v. Clark, 478 U.S. 570, 580–81 (1986). In that event, the jury has found every fact necessary to establish every element of the offense beyond a reasonable doubt. Carella v. California, 491

U.S. 263, 266 (1989) (*per curiam*) (quotation omitted).  *See also* <u>Burger v. Kemp</u>, 483 U.S. 776, 782 n. 5 (1987) (erroneous instruction was harmless where evidence was so dispositive of intent that it could be said beyond a reasonable doubt that jury's deliberations were not affected by them).  *Cf*. <u>Calderon v. Coleman</u>, 525 U.S. 141 (1998) (a federal court may grant habeas relief based on an erroneous jury instruction only when such error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict).

In its review of this claim, the Superior Court made the following determination.

> Finally, Foy claims that the trial court's issuance of erroneous jury instructions violated his federal and state constitutional right to due process. Specifically, Foy asserts errors in the trial court's jury charge on (a) the consideration of Foy's confession; (b) Foy's alibi defense; and (c) the definitional instruction on the crime of burglary.  Because counsel did not object to these instructions, Foy also asserts ineffective assistance of his trial counsel.

> As the Commonwealth points out in its brief, and our review of the record confirms, Foy failed to develop a record regarding counsel's lack of a reasonable basis for not objecting to the trial court's jury charge.  Because Foy failed to prove counsel's performance lacked a reasonable basis, he is not entitled to relief on his ineffectiveness claims.

> In addition, Foy failed to establish that his claims have arguable merit. Foy first argues that the trial court improperly failed to instruct the jurors that they could consider the fact that the Commonwealth had failed to produce a videotape or audiotape of that alleged confession as evidence that the confession had not in fact been uttered.  Foy appears to argue that a missing evidence instruction is applicable where, as here, the evidence never existed.  Regarding the trial court's alibi instruction, Foy argues that the instruction

>> was not tied in with the confession instruction, and thus the jurors were not told that they could discredit the testimony that Foy had confessed to any and all cases, based on their decision to credit his alibi witnesses' testimony in the case (the rationale for which being that Foy had putatively confessed to assaulting [E.F.] even though, if his alibi defense to that case were credited, he was innocent of that assault-thus permitting the conclusions that the police had fabricated [Foy's] confessions or, alternatively, that [Foy] suffered from a personality quirk that caused him to confess to crimes that he had not committed).

Foy does not direct our attention to any legal authority supporting a claim that an adverse inference instruction is required based upon the non-existence of evidence. In addition, Foy cites no legal authority that required the trial court to give his proffered alibi instruction. Because there was no Pennsylvania authority that would require or even allow such an instruction, we cannot conclude that counsel was ineffective in failing to request one.

Regarding the trial court's burglary charge, Foy asserts that it was convoluted. Foy also states that the trial court failed to instruct the jury that

[Foy's] intent to commit a crime inside must exist when he enters the building, *i.e.*, it cannot arise afterwards. Second, it appears that the trial court was saying that [Foy] could commit the crime of Burglary if his intent was to commit the crime of Burglary.

Foy, however, fails to establish prejudice resulting from counsel's failure to lodge an objection to this instruction.

As set forth above, the Commonwealth presented overwhelming evidence against Foy. In light of this evidence, we cannot conclude that but for counsel's failure to object to the jury charge, the outcome of the trial would have been different. Accordingly, Foy is not entitled to relief on this claim.

Sup.Ct.Op., pp. 12-14 (ECF No. 1-7, pp. 14-16) (internal record citations omitted).

This state disposition is consistent with existing precedent of the United States Supreme Court. It does not involve any unreasonable application of clearly established precedent of the United States Supreme Court. Nor does it appear to be based upon any unreasonable determination of the facts in light of the evidence presented. Consequently, Petitioner is not entitled to habeas relief with respect to any claim related to his jury instructions.

8.    Character Witnesses

Petitioner next claims that his Sixth Amendment effective counsel and Fourteenth Amendment due process rights were violated when Trial Counsel ineffectively failed to call known and available good character witnesses to testify at his trial.

The Superior Court made the following determination with respect to this claim.

Foy next claims that his trial counsel was ineffective for failing to present character witnesses. Foy asserts that counsel's failure to present character witnesses violated his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, and article 1, section 9 of the Pennsylvania Constitution.

Our Pennsylvania Supreme Court has long held that the burden of establishing counsel's ineffectiveness is on the appellant because counsel's stewardship of the trial is presumptively effective. To prevail on a claim of ineffective assistance of counsel, an appellant must prove that: (1) the underlying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) the ineffectiveness of counsel caused him prejudice.

Here, Foy claims that his counsel rendered ineffective assistance by not presenting testimony related to his good character. According to Foy, six individuals were ready, willing, and able to present such testimony. These witnesses are Yvonne Foy ("Yvonne"), Diane Foy ("Diane"), Lora Foy-Garner ("Lora"), Helen L. Know ("Know"), Lou Ann Morris ("Morris") and Armand Posapanka ("Posapanka"). Regarding the substance of their testimony, Foy argues that these witnesses were available as "negative" good character witnesses. Foy argues that each witness would have testified that he or she was in a position to hear negative comments about Foy regarding the traits of non-violence and obedience to law, and that he or she in fact heard nothing negative about him regarding those character traits. . . ..

Even if Foy's claim had arguable merit, Foy failed to establish the second and third prongs of a claim of ineffective assistance of counsel, *i.e.*, that counsel's performance lacked a reasonable basis and Foy was prejudiced by counsel's alleged dereliction.

At the hearing on Foy's Petition, Foy's trial counsel, David Shrager, Esquire ("Shrager") testified that the proposed good character evidence would not have conflicted with the defense that he presented on Foy's behalf. However, Foy presented no testimony regarding Shrager's reason(s) for failing to present such testimony. Further, the lack of a reasonable basis is not apparent from the record. In addition, in light of the evidence presented at trial, Foy has failed to establish prejudice resulting from the lack of good character testimony. Specifically, Foy failed to establish that but for counsel's alleged error, there is a reasonable probability that the outcome of the proceeding would have been different.

At trial, the Commonwealth presented evidence that only 1.4% of the population matched the biological characteristics of the semen recovered from the crime scene and rape kit. Analysis of Foy's blood and saliva revealed that Foy's blood profile matched that 1.4% of the population. In addition, Foy's blood profile was consistent with semen collected from the crime scene involving victim D.H. Foy's blood profile also matched the 1.4% of the population having the

same blood characteristics of the semen collected from the underwear of victims E.l. and E.F.

The Commonwealth also presented evidence that Foy's head hair had the same microscopic characteristics as hair found on sheets recovered from the bedrooms of C.R. and D.H. Foy's pubic hair matched pubic hair found in the underwear of E.F. Foy's hair also matched hair collected from the underwear and bedroom of E.L.

The Commonwealth further presented evidence that personal items stolen from the victims were found in Foy's possession and in the residences of Foy's parents and girlfriend. Foy's fingerprints matched fingerprints recovered from the homes of victims E.F., E.L. and C.R. The Commonwealth also provided evidence that Foy confessed to his involvement in the crimes and signed a typewritten statement detailing each incident.

In light of this overwhelming evidence, Foy failed to establish that but for counsel's failure to present character evidence, the outcome of the trial would have been different. Because Foy failed to establish two of the three prongs of a claim of ineffective assistance of counsel, he is not entitled to relief on this claim.

Sup.Ct.Op., pp. 7-10 (ECF No. 1-7, pp. 9-12) (internal citations omitted).

This Court has not discovered any Supreme Court precedent prescribing a rule that directly governs Petitioner's claim. Neither has this Court found any rule imposing a mandatory duty upon defense counsel to present every potential alibi or character witness that may be available. The only situation where the Supreme Court has recognized a constitutional right to provide character evidence concerns capital punishment. In this area, the Supreme Court has recognized that the Eighth Amendment requires a jury to consider the circumstances of the crime and the defendant's background and character during the sentencing phase in a capital trial. *See* Boyde v. California, 494 U.S. 370, 378-81 (1990). The federal courts have interpreted this precedent as resulting in ineffective assistance of counsel where defense counsel failed to investigate or present mitigating character evidence during a capital sentencing. *See, e.g.*, Austin v. Bell, 126 F.3d 843 (6th Cir. 1997). Petitioner's conviction does not raise any capital concerns.

Thus, the Superior Court's holding does not appear to be "contrary to" any clearly established Supreme Court precedent.

Nor is the Superior Court's disposition of Petitioner's witness claim "an unreasonable application of" clearly established Supreme Court jurisprudence. As stated above, a state court's conclusion that counsel was not ineffective is a mixed question of law and fact. The specific historical facts found by a state court in the course of deciding an ineffectiveness claim are accorded a presumption of correctness unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); Berryman v. Morton, 100 F.3d 1089, 1095 (3d Cir. 1996) (state court findings of historical fact made in the course of deciding an ineffectiveness claim are entitled to the presumption of correctness). Petitioner has failed to produce any clear and convincing evidence to rebut this presumption. *See* 28 U.S.C. § 2254(e)(1). Thus, he fails to demonstrate how the introduction of character witnesses could, in any way, have bolstered his defense. Moreover, Petitioner cannot show the necessary element of actual prejudice because significant evidence supported the charges for which he was convicted. Accordingly, he is not entitled to habeas corpus relief with respect to this claim.

9.    Prejudicial Testimony

In his ninth claim, Petitioner asserts that his Fourteenth Amendment due process rights were violated when the prosecution was permitted to introduce inflammatory and unduly prejudicial testimony from the Homestead Chief of Police indicating that no similar rapes had occurred after Petitioner's arrest, and when his trial continued absent a cautionary instruction or a mistrial as sought by Petitioner.

A federal court must keep in mind the standard of review to be applied to allegations of trial error. In this regard, criminal defendants in this country are entitled to a fair, but not a perfect, trial. "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial," and the Constitution does not demand one. United States v. Hasting, 461 U.S. 499, 508 (1983) (internal citations omitted). This focus on fairness, rather than on perfection, protects society from individuals who have been duly and fairly convicted of crimes, thereby promoting "public respect for the criminal process." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).

A claim that one was denied "due process" is a claim that one was denied "fundamental fairness." *See* Riggins v. Nevada, 504 U.S. 127, 149 (1992) ("We have said that 'the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial'"); Lisenba v. California, 314 U.S. 219, 236 (1941) ("The aim of the requirement of due process is . . . to prevent fundamental unfairness"); Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) ("In order to prevail on a claim that an . . . error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial"). Because the guideposts for decision making under the rubric of due process are lacking, the Supreme Court has cautioned that:

> [i]n the field of criminal law, we have defined the category of infractions that violate 'fundamental fairness' very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order.

Medina v. California, 505 U.S. 437, 443 (1992) (internal quotations and citations omitted).

> Judges are not free, in defining 'due process,' to impose on law enforcement officials their personal and private notions of fairness and to disregard the limits that bind judges in their judicial function. They are to determine only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.

Dowling v. United States, 493 U.S. 342, 353 (1990) (internal quotation and citations omitted).

A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted. Foy v. Donnelly, 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted). Where the evidence of guilt is so strong that there is no reasonable probability that the verdict might have been different, errors, if any were committed, could not deny the defendant fundamental fairness. *See, e.g.*, United States v. Copple, 24 F.3d 535, 547 n. 17 (3d Cir. 1994) ("To the extent any of the incidents constituted error, we believe that in light of the strong evidence of guilt, the errors were harmless and did not deprive Copple of a fundamentally fair trial.").

Petitioner raised this claim in his direct appeal where the Supreme Court of Pennsylvania agreed that the evidence should not have been admitted. Commonwealth v. Foy, 531 Pa. 322, 612 A.2d 1349 (1992). Therein, the Court concluded that, even "where a series of crimes is so similar as to bear the marks of a common signature," evidence of their cessation after the arrest of a defendant is not relevant. *Id*. at 1351–52.

> There are many possible reasons for an absence of additional reported crimes that are consistent with the defendant's innocence. Police testimony concerning the reports could be inaccurate. Further signature crimes may have been committed but never reported to the police. The true culprit may have died, or left the community, or been incarcerated on unrelated charges about the time of the defendant's arrest. Or perhaps the true culprit has decided to refrain from further acts of violence in order to shift suspicion onto the defendant and thereby escape detection.

*Id*. at 1351 (internal citation omitted).  The court also held that, even if such cessation evidence was considered relevant, its probative value would be substantially outweighed by the danger of unfair prejudice.  *Id*. at 1352.  Specifically, the court suggested that the jury might place undue weight on such evidence and find the defendant's guilt based on that fact alone.  *Id*.

Notwithstanding, while the Court held that admissibility of this evidence was improper, it was harmless and did not justify reversing the conviction.  Specifically, the Supreme Court held as follows.

It is well established in this Commonwealth that an error can be harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless.  The burden of establishing that the error was harmless beyond a reasonable doubt rests with the Commonwealth.

Error is considered to be harmless where:  (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

In the case *sub judice*, we conclude that the Commonwealth has demonstrated beyond a reasonable doubt that the admission of Police Chief Kelly's testimony that no further crimes had occurred since Appellant's arrest was harmless error in view of the overwhelming evidence presented by the Commonwealth with respect to Appellant's guilt.  The Commonwealth introduced the following items into evidence during the course of trial:  (1) Appellant made a voluntary and informed admission of his responsibility for all five criminal episodes; (2) usable fingerprints recovered at the scene of three assaults were determined to be the same as Appellant's; (3) items identified as stolen from two victims were recovered during a search of Appellant's parents' residence and another stolen item was recovered during the search of Appellant's girlfriend's residence; (4) during a tour of the neighborhood with police, Appellant identified the residences of all the victims; (5) the blood type and characteristics of the semen samples obtained from the victims were consistent with those of a minute portion of the population and Appellant; and (6) samples of head and pubic hair discovered at the scene of four episodes were consistent with Appellant's.

For these reasons, we affirm on an alternative basis the order of the Superior Court which in turn affirmed the judgment of sentence of the Court of Common Pleas of Allegheny County.

Commonwealth v. Foy, 531 Pa. 322, 326-328, 612 A.2d 1349, 1352 (1992).

It is clear that the state court reviewed Petitioner's claim under the "harmless beyond a reasonable doubt" standard set forth in Chapman v. California, 386 U.S. 18 (1967), which applies on direct appeal. On collateral review, however, this Court applies the harmless error standard set forth in Kotteakos v. United States, 328 U.S. 750 (1946), analyzing whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 629–30 (1993) (rejecting the more stringent "harmless-beyond-a-reasonable-doubt standard" set forth in Chapman v. California, 386 U.S. 18 (1967)); *accord* Fry v. Pliler, 551 U.S. 112, 119–22 (2007) (discussing Brecht post-AEDPA). *See also* Hassine v. Zimmerman, 160 F.3d 941, 953 (3d Cir. 1998).

> As recognized by the Supreme Court in Brecht:

> State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under Chapman, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error. For these reasons, it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that Chapman requires state courts to engage in on direct review.

Brecht, 507 U.S. 619, at 636 (citation omitted). Thus, the Court held that the Kotteakos harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type.

Under Brecht and its progeny, a constitutional trial error is not harmless if the court is in "grave doubt" as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict. O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "Grave doubt" exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id*. at 435.

In evaluating Petitioner's claim, I must determine whether, and to what extent, the jury's

decision was influenced by the prejudicial statements. The crucial inquiry is the "impact of the error on the minds of the jurors in the total setting." Yohn v. Love, 76 F.3d 508, 523 (3d Cir. 1996) (citing Kotteakos, 328 U.S. at 764). While the nature of the evidence is important, I must also examine the phases of the trial affected by the error and determine whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error. Id. (citing Kotteakos, 328 U.S. at 765). In so doing, I must weigh the impact of evidence on the jury and make a judgment as to how the jury would reasonably perceive Petitioner's version of events with and without the violation. See Hassine v. Zimmerman, 160 F.3d 941, 955 (3d Cir. 1998).

In Brecht, the Court held as follows:

> . . . All that remains to be decided is whether petitioner is entitled to relief under this standard based on the State's Doyle error. Because the Court of Appeals applied the Kotteakos standard below, we proceed to this question ourselves rather than remand the case for a new harmless-error determination. At trial, petitioner admitted shooting Hartman, but claimed it was an accident. The principal question before the jury, therefore, was whether the State met its burden in proving beyond a reasonable doubt that the shooting was intentional. Our inquiry here is whether, in light of the record as a whole, the State's improper use for impeachment purposes of petitioner's post-Miranda silence "had substantial and injurious effect or influence in determining the jury's verdict." We think it clear that it did not.
>
> The State's references to petitioner's post-Miranda silence were infrequent, comprising less than two pages of the 900-page trial transcript in this case. And in view of the State's extensive and permissible references to petitioner's pre-Miranda silence- i.e., his failure to mention anything about the shooting being an accident to the officer who found him in the ditch, the man who gave him a ride to Winona, or the officers who eventually arrested him-its references to petitioner's post-Miranda silence were, in effect, cumulative. Moreover, the State's evidence of guilt was, if not overwhelming, certainly weighty. The path of the bullet through Mr. Hartman's body was inconsistent with petitioner's testimony that the rifle had discharged as he was falling. The police officers who searched the Hartmans' home found nothing in the downstairs hallway that could have caused petitioner to trip. The rifle was found outside the house (where Hartman was shot), not inside where petitioner claimed it had accidently fired, and there was a live round rammed in the gun's chamber, suggesting that petitioner had tried to

fire a second shot. Finally, other circumstantial evidence, including the motive proffered by the State, also pointed to petitioner's guilt.

In light of the foregoing, we conclude that the Doyle error that occurred at petitioner's trial did not substantially influence the jury's verdict. Petitioner is therefore not entitled to habeas relief, and the judgment of the Court of Appeals is affirmed.

Brecht, 507 U.S. at 638-39.

In the case at bar, the undisputed facts reveal that only 1.4% of the population matched the biological characteristics of the semen recovered from the crime scene and rape kit involving the victim. Analysis of Foy's blood and saliva revealed that Foy's blood profile matched that 1.4% of the population. In addition, Foy's blood profile was consistent with semen collected from the crime scene involving victim D.H. Foy's blood profile also matched the 1.4% of the population having the same blood characteristics of the semen collected from the underwear of victims E.l. and E.F. The Commonwealth also presented evidence that Foy's head hair had the same microscopic characteristics as hair found on sheets recovered from the bedrooms of C.R. and D.H. Foy's pubic hair matched pubic hair found in the underwear of E.F. Furthermore, Foy's hair also matched hair collected from the underwear and bedroom of E.L. In addition, personal items stolen from the victims were found in Foy's possession and in the residences of his parents and girlfriend. Foy's fingerprints matched fingerprints recovered from the homes of the victims. Finally, the Commonwealth also provided evidence that Foy confessed to his involvement in the crimes and signed a typewritten statement detailing each incident.

In light of this overwhelming evidence, this Court simply is not in grave doubt that the improper admission of the evidence had a "substantial and injurious effect or influence" on the jury's verdicts. Accordingly, Petitioner is not entitled to relief as to this claim.

10.    <u>Pretrial Publicity</u>

Next, Petitioner argues that his Sixth Amendment impartial jury and Fourteenth Amendment due process rights were violated when his case was tried before an Allegheny County jury rather than, as he requested, by a jury drawn from another area of the state that was not inundated with the prejudicial pretrial publicity that existed in Allegheny County.

The Due Process clause of the Fourteenth Amendment guarantees a criminal defendant the right to a trial by an impartial jury free from outside influences. <u>Sheppard v. Maxwell</u>, 384 U.S. 333, 362 (1966); <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963); <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961). When prejudicial pretrial publicity or an inflamed community atmosphere precludes seating an impartial jury, due process requires the trial court to grant a defendant's motion for change of venue, <u>Rideau</u>, 373 U.S. at 726, or a continuance, <u>Sheppard</u>, 384 U.S. at 362-63. Ultimately, the question is whether a defendant's trial was fundamentally fair. Two standards guide analysis of this question. They are the "presumed prejudice" standard and the "actual prejudice" standard.

"Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." <u>Rock v. Zimmerman</u>, 959 F.2d 1237, 1252 (3d Cir.1992), *overruled on other grounds by* <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993); *see also* <u>Sheppard</u>, 384 U.S. at 333; <u>Rideau</u>, 373 U.S. at 723. Such cases, however, are "exceedingly rare." *Id*. at 1253; <u>Flamer v. Delaware</u>, 68 F.3d 736, 754 (3d Cir. 1995). For a court to presume prejudice, "the community and media reaction ... must have been so hostile and

so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury." *Id*. at 1252.

The United States Supreme Court has explained that, even when pretrial publicity is extensive and severe, a lapse in time between the publicity and the trial can dissipate any prejudice that may have resulted. In Murphy v. Florida, 421 U.S. 794, 802 (1975), the Supreme Court held that extensive media coverage of the defendant's prior crimes did not amount to prejudice because the publicity had stopped seven months before jury selection. In Patton v. Yount, 467 U.S. 1025 (1984), the Court found no prejudice when the extensive and prejudicial media coverage occurred four years before the trial itself.

> The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant. It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have long passed. It would be fruitless to attempt to identify any particular lapse of time that in itself would distinguish the situation that existed in Irvin. But. it is clear that the passage of time ... can be a highly relevant fact. In the circumstances of this case, we hold that it clearly rebuts any presumption of partiality or prejudice that existed at the time of the initial trial.

*Id*. at 1035 (emphasis added) (internal citations and footnote omitted).

The second standard utilized by the Supreme Court in pretrial publicity cases is "actual prejudice." To find the existence of actual prejudice, a petitioner must satisfy two basic prerequisites. First, he must show that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin, 366 U.S. at 727. Second, he must show that these jurors could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." *Id*. at 723. As the Supreme Court has explained:

It is not required ... that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id*. at 722-23 (emphasis added).

In its review of this claim, the Pennsylvania Courts held as follows.

Defendant's second assignment of error is the court's denial of his request for a change of venue and a change of venire. It is defendant's contention that he did not receive a fair trial from an impartial jury from Allegheny County due to the extensive publicity surrounding the case.

An accused's right to impartial and indifferent jurors is dictated by the constitutional standard of fairness. Murphy v. Florida, 421 U.S 794 (1975); Irvin v. Dowd, 366 U.S. 717 (1961). Prospective jurors can qualify, however, despite their exposure to media reports on the crime and pre-trial proceedings. Whether veniremen enter *voir dire* with opinions of guilt or innocence is also not reflective of partiality, providing they can dismiss their externally-induced opinions and produce a verdict reflective solely of the evidence presented at trial. Murphy v. Florida, *supra*; Irvin v. Dowd, *supra*.

Accordingly, pre-trial publicity alone does not preclude the empanelling of an objective, impartial jury, nor does it create a presumption of prejudice. Commonwealth v. Casper, 481 Pa. 143, 392 A.2d 287 (1978).

Moreover, it is the accused's burden to develop a presumption of partiality and to demonstrate actual and unyielding prejudice among jurors. Commonwealth v. Hoss, 489 Pa. 195, 364 A.2d 1335 (1976).

During the pre-trial stage of the case the defendant on two occasions filed a motion for a change of venue. The first motion was based on the cumulative reporting of both the television and newsprint media primarily concerning a request for random voluntary fingerprinting of black male Homestead residents by Homestead Police Chief Chris Kelly. Defendant points to the publicity surrounding the controversial request, but does not give specifics in support of his argument that said publicity prejudiced him. Absolutely no indicia of partiality or actual and unyielding prejudice on the part of the empaneled jurors has been shown by defendant.

The media coverage of the arrest of the defendant and the fingerprinting request of the Homestead police Force was reported extensively, but responsibly and objectively. Furthermore, the publicity concerning the case occurred primarily some seven months prior to the beginning of defendant's trial. The cumulative effect was not "so pervasive, so inflammatory, and so inculpatory, so as to raise a presumption of prejudice, and the motion for a change of venue based on the aforementioned publicity was properly denied.

Defendant's second motion for a change of venue was based on the fact that, on the day prior to the' beginning of selection of a jury in this case, a convicted serial rapist known as the "Shadyside rapist" was sentenced to a term of imprisonment. Again, defendant points to the fact of the media coverage of this event but does not give any specifics in support of his argument that the sentencing of the "Shadyside rapist" mandated a change of venue herein. There is no indication that the publicity surrounding the separate case of the "Shadyside rapist" had any prejudicial impact on defendant and precluded him a fair trial. There was no error on the part of the court in denying the request for a change of venue based on the above publicity.

Tr.Ct.Op. (ECF No. 1-1, pp. 8-9) (adopted by the Superior Court).

My independent review of the state court record satisfies me that the factual determinations by the state courts are "fairly supported." Moreover, Petitioner has failed to show that the state court determination is contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Consequently, he is not entitled to habeas corpus relief as to this claim.

11, 12 & 13. <u>Petitioner's Confession</u>

Petitioner claims that his Fifth Amendment self-incrimination and Fourteenth Amendment due process rights were violated when his extrajudicial statement to police investigators was not excluded from evidence at his trial. He further claims that his Petitioner's Sixth Amendment right to jury decision making and his Fourteenth Amendment due process rights were violated when his defense attorney was precluded from arguing to the jury that his putative confession was in fact involuntarily uttered, and when he was further prevented from

having his jury decide for itself whether his confession voluntary or involuntary. Finally, he asserts that his Fourteenth Amendment due process rights were violated when he was precluded from calling an Assistant District Attorney to testify as a witness on the issue of the voluntariness of his confession.

There are two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000). In <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966), the Supreme Court determined that custodial police interrogation inherently involved "compelled" testimony for purposes of the Fifth Amendment. To combat this inherent compulsion, the Supreme Court imposed an obligation on the police to follow certain procedures when dealing with persons accused of criminal conduct. These procedures, referred to as "Miranda" warnings, require the police, prior to the initiation of questioning, to inform the accused of the right to remain silent, the right to have an attorney present, that the accused is suspected of involvement in criminal activity and that any statement made by the accused may be used by the police as evidence against him. *Id.* at 468-470. The Miranda rule further requires the police to respect an accused's decision to exercise the rights protected by the Miranda warnings and cease interrogation if the accused indicates that he wishes to remain silent or if he states that he wants an attorney. *Id.* at 473-474.

In determining whether a confession was voluntary, a court must determine whether the confession was "the product of an essentially free and unconstrained choice by its maker," that it was "the product of a rational intellect and a free will" and that the appellant's will was not "overborne." <u>United States v. Swint</u>, 15 F.3d 286, 289 (3d Cir. 1994) (internal quotations and citations omitted). Courts look to the totality of circumstances to determine whether a

confession was voluntary, including: the length of the interrogation; its location; its continuity; the defendant's maturity; physical condition; and mental health. *Id*. (citations omitted). The Court should consider all of these factors to determine whether the circumstances show that the conduct of law enforcement officials was such as to overbear the defendant's will to resist. Rogers v. Richmond, 365 U.S. 534, 544 (1961). Moreover, unless there is police conduct causally related to the confession, a confession is considered voluntary. Colorado v. Connelly, 479 U.S. 157, 164 (1986). Thus, a court will not hold that a confession was involuntary unless it finds that it was the product of "police overreaching." *Id*.

The state courts made the following determination with respect to these issues.

> Defendant next alleges reversible error on the part of the court for denying the pre-trial omnibus motions to suppress his confession and for ruling that defense counsel was precluded from attacking the voluntariness of the same confession, since defendant denied ever making the statements at all. As to his first contention, defendant argues that his inculpatory statement to the authorities was the product of an "unnecessary delay" between arrest and arraignment. A review of the record reveals otherwise. Defendant was originally arrested and charged with receiving stolen property on September 3. 1987. at 4:00 P.M.

> Defendant was interrogated and gave a statement to the police that he bought the gun because the "price was right" and that he "thought it was hot." The interrogation lasted until approximately 4:55 P.M. concerning the stolen weapon. At approximately 5:05 P.M., after the comparison of defendant's fingerprints and those found at the crime scenes, defendant was once again advised of his Miranda rights and the police began interviewing him concerning the rapes.

> Defendant initially denied any involvement in the burglaries and rapes, but confessed to his involvement in two of the assaults after detectives explained to him the nature of the fingerprint evidence that incriminated him.

> The police then placed him under arrest for the two incidents defendant confessed to, and defendant was formally arraigned at 9:06 P.M. The officers then informed defendant that he was a suspect in the other crimes as well. The officers then arranged for an unmarked police car to tour the Homestead area so that defendant could show police the places where he had committed crimes. During this trip, defendant directed officers to the homes of the four female victims herein and confessed to his role in the crimes. Defendant was thereafter

transported to Allegheny County Police headquarters in Downtown Pittsburgh where a typewritten statement was taken and the paperwork prepared to charge him with the other crimes he admitted to. By the time all of the foregoing had transpired the time was 1:33 a.m.

The confession made by the defendant herein was not the product of an unnecessary delay. Defendant has not come close to showing a nexus between a delay and the challenged evidence that would entitle him to the relief he seeks, namely, suppression of his properly obtained confession and there was no error on the part of the court.

As to defendant's challenge to the court's ruling precluding defense counsel from attacking the voluntariness of his confession, the record reveals that defendant denied <u>ever</u> making any statements to the authorities so that the issue of voluntariness was never raised. To allow defense counsel to argue voluntariness in light of defendant's denial would have been absurd and the motion was properly denied.

Tr.Ct.Op. (ECF No. 1-1, pp. 9-11) (emphasis in original) (internal citations omitted).

This determination is not contrary to, or an unreasonable application of, clearly established federal law. *See,e.g.*, <u>United States v. Andrews</u>, 231 Fed. App'x. 174 (3d Cir. 2007) (affirming District Court determination that government satisfied its burden to show that defendant's statements were voluntary and his free will was not overborne by the police). Accordingly, he is not entitled to habeas relief as to this claim.

14. <u>Prosecutorial Misconduct</u>

Next, Petitioner argues that his Fourteenth Amendment due process rights were violated when his trial was allowed to proceed, over his timely objection, in the face of prosecutorial misconduct. Specifically, he claims that the prosecutor made unduly prejudicial comments during closing arguments.

Allegations of prosecutorial misconduct are reviewed under the standards for fundamental fairness as guaranteed under the Due Process Clause. <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986); <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982). To constitute a due process

violation, the prosecutorial misconduct must be " 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " United States v. Bagley, 473 U.S. 667, 676 (1985) (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)).  The relevant question is whether the prosecutors' comments so infected the trial with unfairness so as to make the resulting conviction a denial of due process.  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  In making this determination, the statements or conduct at issue cannot be viewed in isolation.  Rather, a court must assess the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution.  United States v. Young, 470 U.S. 1, 11 (1985).  In other words, "the court must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." Id.  Moreover, a prosecutor's statement regarding the credibility of a witness can constitute grounds for reversal only if the defendant can show that he was prejudiced by those comments. United States v. Swinehart, 617 F.2d 336, 339 (3d Cir. 1980).  A determinative factor in this analysis is whether the prosecutor's comments suggested that he or she had knowledge of evidence other than that which was presented to the jury.  Buehl v. Vaughn, 166 F.3d 163, 176 (3d Cir. 1999) (citations omitted).

The Pennsylvania Courts made the following determination with respect to this claim.

Defendant's next allegation of reversible error is directed at the District Attorney, whom he claims prejudiced him by attempting to inflame the jury by the following remarks:

A)      Things just seem to happen to Mr. Foy, doesn't it.

B)      Dennis, you can go or are each and everyone of you glad now and think it proper that the police kept asking questions, that they didn't just say Howard, we'll accept what you said and let this guy go or are you really glad they got search warrants and recovered those items?  Are you glad they got his blood type so they could compare his blood type to that left by the actor in these cases?  Are you glad that they got his head hairs and pubic hairs.

C)    There's been no crime since September 3, 1987, since Dennis Foy was [arrested].

A new trial is required where the unavoidable effect of improper remarks would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict. The effect of such remarks depends upon the atmosphere of the trial, and the proper action to be taken is within the discretion of the trial court.

While the prosecutor's remarks (in particular comment "A" above) may have arguably been intemperate, they were isolated remarks that came at the conclusion of a lengthy trial. They could not have so prejudiced the jury as to render them incapable of weighing the evidence objectively and returning a true verdict. Defendant is not entitled to a new trial on this basis.

Tr.Ct.Op. (ECF No. 1-1, pp. 13-14)

Again, Petitioner has failed to show that this determination is contrary to, or an unreasonable application of, controlling Supreme Court precedent. Accordingly, he is not entitled to relief as to this claim.

15 & 16.    Inordinate Delay

Finally, Petitioner claims that the 13 year delay in resolving his PCRA proceeding denied him due process. In Hassine v. Zimmerman, 160 F.3d 941 (3d Cir. 1998), our Court of Appeals held that, while excessive delay in state collateral proceedings could violate due process, it could not provide a valid basis for granting federal habeas corpus relief. Hassine, 160 F.3d at 954. In reaching this decision, the court noted that its role in reviewing an application for habeas corpus was limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding did not enter into the habeas calculation. Id. "Federal habeas power is limited to a determination of whether there has been an improper detention by virtue of the state court judgment." Id. (internal quotation omitted). Delay in processing a collateral claim simply does not make the continued

imprisonment of the defendant unlawful, and hence, does not warrant federal habeas corpus relief. *Id.* at 954 (quotation omitted). *Accord* Lambert v. Blackwell, 387 F.3d 210, 247 (3d Cir. 2004) ("[A]lleged errors in collateral proceedings are not a proper basis for habeas relief from the original conviction."); <u>Mason v. Myers</u>, 208 F.3d 414 (3d Cir. 2000) (same).

### E. Certificate of Appealability

28 U.S.C. Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a habeas proceeding in which the detention arises out of process issued by a State court unless a certificate of appealability has been issued. A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2). Here, the record fails to show a violation of Petitioner's constitutional rights. Accordingly, a certificate of appealability will be denied. An appropriate order follows.

**AND NOW**, this 6th day of March, 2013:

**IT IS HEREBY ORDERED** that the Petition for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Plaintiff has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

By the Court:

<u>s/ Cynthia Reed Eddy</u>
Cynthia Reed Eddy
United States Magistrate Judge

Dennis Foy
AJ-2758
SCI Rockview
PO Box A
Bellefonte, PA 16823-0820